In this case, as you know, it's about the Quiet Title Act, and it's about the reach of the exception to the Quiet Title Act. The question becomes, in our mind, whether the Quiet Title Act exception to jurisdiction against the United States speaks to the status of land or to the tacit treatment of the status of land made by the United States. I have not seen a case, well, at least in Mapps v. United States, Alaska v. Babbitt, they both use the rubric status of the case. They both speak of this, but no one defines it. In this case, you have a situation you haven't dealt with before, and this is a case where the United States went out into the community, purchased an interest, on the face of it as a proprietary purchaser of the interest, purchased it in accordance with California law in terms of the way the documents were written, left the seller with the understanding that they had sold exactly what you would have sold if you sold an easement to someone other than the United States, i.e., an interest in their land over which they retained a degree of control because they continued to own the Serbian estate. Some 40 years later, they find, or 35 years later, they find that the United States, at the moment it made the purchase, intended to treat this land, this easement, as impressed with a trust, did not disclose that to the seller, did not take any action that would disclose that to the seller. The United States points to one document where they use the term, this will be held in trust, but it's an intra-government document, nothing that went to the seller told her this. And then suddenly, because of various changes in law that affect Indians, suddenly this interest becomes expanded to the point where if it were a normal purchaser of an easement and a normal seller of an easement, it could be stopped under California law because California law and property law throughout the United States basically says that the owner of the Serbian estate maintains his right to be able to control the use of that easement if it goes beyond that for which it was originally contemplated. Going from a rural easement that's used for normal access to a residential area and normal access to a farming area to 2,700 cars a day is an exponential change. And, you know, there are many other factual changes that we obviously can't talk about here because our question is a jurisdictional one. Let's assume, for example, that the United States had in fact acquired it, as you contend, in its own name to begin with. Do you contend that the United States could not transfer its interest and create a trust interest thereafter? Or perhaps even, well, I'll leave it with that. I think there is a statute and a regulation that I gave you for the United States to try to convert something. The question is can they change the plaintiff's property interest by a unilateral act? I have not seen anything that says they can change the plaintiff's property interest by a unilateral act. But if they change the character of the interest that they own, then, of course, that would have impact on the property rights that you own to a certain extent. And we don't know, we do know that the United States later, you know, after the origination of the rancheria and so on, that they did come up with a procedure, perhaps it was especially for the California situation, where they had precluded buying land and trust under the Four Reservation Acts, et cetera, for a period of time. They did come up with a procedure whereby the United States could do that conversion. But it required a procedure where other interested parties would have an opportunity to make a case as to why this should or should not be done, what the impact on them would be. If that procedure had been followed in this situation, we don't know what the outcome would have been. We do know that it wouldn't have happened automatically, that there would have been an opportunity for the pro-shuls, certainly the pro-shuls whose interest is really now gone in that road, because they can't really compete to use it. Well, could they before? I mean, didn't the BIA turn it into a road? It was always a road. It was a road the pro-shuls had used for years. And I think that the complaint shows, and I don't think anybody's disputed, that they had allowed the Indians to use it as an alternative access road to their rancheria. Are we really talking about the use of the physical real estate that the road sits on top of, or talking about the fact that there are a whole lot more people traveling down that road than there would or will be if the casino was built than anyone had anticipated. But the use of that property itself, speaking of the specific property the road sits on top of, it sounds like it hasn't changed at all. Well, I understand what you're saying. No, cars are still traveling over it. It's still a road. There's no question about that. Absolutely no question about that. So what's the change? That doesn't relate to the burden on a serving estate. If you have a serving estate where you intend to use that road, and everybody knows this when you do the deal, you intend to use that road to continue to move your farm equipment in, to get to some of your outbuildings and certainly to your orchards and vineyards. You intend to use it to get your produce out. They intend to use it, and you say to them, you can use it as well. We know what you're going to do. You're going to do what you've always done when we've let you use it consensually. You're going to drive your cars in to get to your homes. Your school buses are going to go up there. Delivery people will go up there. Your visitors will go up there. It's not an incompatible use. Very different from, oh, you're going to put 3,000 cars a day on that road. When there's a problem, you're going to direct traffic. I can never get my equipment in there, essentially. I'm not going to be able to do that. When you think about the difference between 2,700 cars a day and maybe a combine and 12 cars, the burden is exponentially different. The bargaining for that kind of an interest would be exponentially different. And certainly it's the equivalent. If you look at what the Quiet Title Act exception does, it's the equivalent of selling a fee. If you're aware that it's going to go into trust, if you're aware that that means that you have no capacity to talk to the government about their expansion of use, you're doing a different deal. And really that's the question. Did the government have the obligation to talk about it at the front end? If they didn't talk about it at the front end and they don't put it on the title ever, have they made this trust land in terms of the status the cases talk about? Or have they, for all intents and purposes, purchased a proprietary interest that they later by circumstance convert? I think you also, and I've said this, the United States disputes this and says we can't talk at all about anything that led up to this easement because that infringes on their right to be absolutely immune, unless you're going to tell me to shut up. I will make a couple of points on that level because I do think that they're important to the way you look at the case. The other cases in which you have looked at interests where there is no public trust impressment available for people to look at really are like the Duncan case. In the Duncan case, it was the same thing. The United States had purchased land for Eritrea, arguably in a proprietary sense. They had these trust responsibilities. When they alienated the land, they alienated the people who had no clue it was trust land in the United States' mind because it didn't say that on the title. Then the United States, that was a breach of their fiduciary duties, and that's the way you looked at it. Now look at it in the context of if they had purchased the land from these people and then tried to cancel the purchase because, oh, oh, it's a trust issue here, and you can't purchase this land from us. Could they do that? And that's really the question. Is this what the quiet title exception was meant to reach? And I'll save the remainder of my time. Thank you. Ms. Thurston. Good morning, Your Honors, and may it please the Court. I'm Alice Thurston representing the United States today. With me at council table is Frank Lawrence representing the Tribe, and we will be dividing argument time, eight minutes for me and two for Mr. Lawrence. As a general matter, the Quiet Title Act waives the government's sovereign immunity to suits for disputes over lands. The exception to this waiver, which is applicable here, is that the waiver section does not apply to trust or restricted Indian lands. Most of what you've heard so far goes to the merits of whether or not this road is held in trust, but for purposes of determining whether or not the Indian lands exception applies, the burden on the government is quite minimal. Under the Wildman case, nothing in the statute or its history suggests that the United States was to be put to the burden of establishing its title when it has a colorable claim and has chosen to assert its immunity on behalf of land, which the government declares that it is holding in trust for Indians. So in other words, the government's title here to this easement is not disputed. What the government has also done is declare that it is being held in trust. I believe that the Duncan case that was cited in the opening presentation amply supports the government's presentation that lands that are taken by the government and supervised for the use of Native Americans are held in trust as a presumption, and it's up to opposing counsel to rebut that. In this case, the district court not only applied the Wildman standard but applied the heightened standard of the Alaska v. United States case that was decided in 2000, which is that the United States has a colorable claim that the land is held in trust. Here, all of the evidence points to the fact that the easement was specifically sold to assist the Native Americans living at the time on the reservation. It was called a reservation in the easement. The land for the reservation was bought by the United States and was held in trust by the United States, as the Duncan case points out. And the easement itself was specifically and acknowledgedly purchased to enable the Native Americans to access the reservation and the United States to upkeep the road. There's correspondence which refers to the fact that it was a public road, that school buses went back and forth, that post offices went back and forth. You know, isn't there something? When the easement was purchased, I thought it was pursuant to a statute that said it was to help terminate the trust land, not add additional. I don't necessarily believe that's the case. This rancheria was never terminated. It was always held in trust. It has never been subject to termination. And I'm not sure that the road was purchased to further any termination in this case. Well, the interesting question I think here is what does colorable claim mean and how far can the inquiry go? I gather from your papers you say once the government declares it to be trust land, that's the end of the argument. And I hope that's not your position. There's two positions here. I think the court has an escalating scale of inquiry in the Wildman case and the Alaska case. I do believe that is what Wildman says, if you look at it as a very literal matter. The Alaska case goes further, and the question is whether there's a rational basis for the government assertion that it's being held in trust and whether it's not an arbitrary or frivolous assertion. And in this case, I think that because of the inordinate number of facts supporting that this was a purchase by the Bureau of Indian Affairs for the Native Americans, it was on behalf of the tribe. And under Duncan, it does not have to be expressed. So the idea that it's somehow – there's some shadow on the fact that the government is holding it in trust because it's not expressed in the easement is simply wrong. It says here, 667 Fed 2nd of 42, the deed need not be expressed. Rancheria Act states the understanding that rancheria lands will be held in trust. And it's not expressed in the deeds of purchase for a rancheria. It isn't expressed in this particular deeds of purchase for the easement. But if I may answer your question further, because I've been looking at the two cases where no colorable claim was found. There was the individual, the Alaska case. They all are Alaska v. Babbitt, so excuse me for not being able to distinguish them. This was the 99 case where the individual Native Alaskan was seeking an allotment. And what the court found in that case was that because the IBLA had changed a legal position, it was a legal impossibility for that Native Alaskan to have had a claim. Right. Well, isn't that the argument here? I mean, if you accept their statutory argument, the plaintiff's statutory argument is that this is a matter of law, and therefore it's not a matter of really assertion that these things can be determined. And if they're right on the law, then don't we have jurisdiction? No, I disagree that it's purely a matter of law. I don't think that that's entirely what they're saying. They're saying that because it doesn't say in the easement that it was allotment. Well, that's one of their arguments. But then they go on to the statutory history and argue that this could not have been taken in the two capacities that are identified. In other words, it could not have been taken at trust at the time, and it obviously wasn't taken for allotment purposes. So, I mean, they have a – I guess my question is not necessarily because I understand your position from the papers, but how do we evaluate that in terms of colorable title? I still think that because I do believe it's a mixed question of law and fact. I understand that they have a legal argument that is somewhat attenuated. I don't think that Duncan supports their case at all, so I think you have to evaluate the merits of their legal argument on that basis. But the two cases that this Court has decided where there was no colorable claim, it was an impossibility claim. The other case was the more recent Alaska, the United States case, the 2000 case. And, again, there was no possibility that the United States could have held legal title to riverbeds for the tribes at the time it was holding title for the State. So, I mean, it's a very far cry from this case where you have a lot of questions about what was the intent. When you interpret an easement, there is some inquiry as to the intent of the parties. And here it's not a question of that. That goes to the merits of the law. I'm sorry. Let me go back again. What is the status of the rancheria now? I'm not sure what your question goes to. Is it trust land? It is trust land. It has been trust land this whole time. It remains trust land. And it was never terminated. It was bought as a rancheria by the United States in similar circumstances to the purchase of this easement. However, it is the government's position that the status of the rancheria is irrelevant to the status of the land. The land could be privately held Native American land that this road goes to. And if the road were purchased to benefit these Native Americans living in any particular area, and that was the purpose and that was the government was buying it to take it in trust. I understand. That is sufficient. So why doesn't that present more or less a purely legal question? In other words, plaintiffs say, look, you have to state on the deed. You have to clearly identify in what capacity you're purchasing the land. And that may or may not be. That's capable of a legal resolution. You say, no, if we're doing it to benefit a tribe or an individual Indian, then that Indian member through an allotment, whether it's private or not, that's sufficient. Now, that is, if we had to look behind it to see whether or not, in fact, the United States was doing that, that would be a question of, I think, fact for the district court. Well, the standard is not, is not do you have to verify that the government's claim is correct. And I see I'm eating into Co-Counsel's time. But the standard. Thank you. The standard is whether or not the government's being arbitrary or frivolous and whether there's, in fact, a rational basis for stating this. So the inquiry stops there as opposed to in the other cases it was so obvious that it was a legal impossibility, that they are, I think, distinct on a spectrum in that way. I think that's a good segue to hear from the government. Tribe. Well, yeah. Frank Lawrence, representing the tribe. Time was held in trust, anyway. Your time was held in trust. Your Honors, we've cited a number of Supreme Court cases holding that for property to be held in trust for a tribal government. There's no requirement that the words trust or any explicit reference be made. The Mitchell case, Oklahoma Tax Commission, also Navajo Tribe, Maricopa, Amex, Coble, all these cases stand for that proposition. The fee-to-trust transfer statute that the appellants refer to postdated the easement purchase by decades and is by no means the only way in which a trust relationship can occur, obviously. The Supreme Court has held trust relationships to exist for centuries prior to that fee-to-trust transfer process. So I wanted to make that point. The government's view, Judge Thomas, you asked about what constitutes a colorable claim. The government's position in this case is supported by the federal statutory and regulatory structure dealing with Indian reservation roads. In our brief, we pointed out that the Commissioner of Indian Affairs has an obligation to provide access to Indian lands. This is 25 CFR Part 170. Those regulations define an Indian reservation road as any road that provides access on a reservation or to a reservation. And it also requires that Indian reservation roads be maintained free and open to the public. So that statutory and regulatory structure in this particular case supports, on the legal side of the analysis, the government's conclusion that there's a colorable claim. We pointed out also that the Wildman case, the Ninth Circuit held, that an Indian reservation road is per se in trust by the government for the benefit of the tribe. That goes to the fundamental nature of the relationship between the federal government and tribal governments. I wanted to point out, I think, on the Quiet Title Act, the Indian lands exception, the very purpose of that exception is exemplified by this case. This is a landlocked reservation. There's some reference in the record to a second access road. If you had a four-wheel drive in wintertime, you could not access the reservation by that road. I've looked on the ground. You can't find it. This is the only means of ingress and egress to this reservation, and if this means of ingress and egress could be challenged, this tribe would be forever barred from engaging in any economic development activity on its reservation. And that would be directly contrary to Congress's policies. That's why we need this kind of exception in the Quiet Title Act. May I ask a practical question? It seems to me your clients have to live with this neighbor. Would the assistance of the circuit mediator help you resolve this in a way? Well, Your Honor, we, I think the record. You don't have to tell me what happened. I'm just. Yeah. The record reflects, I think, that the tribe was approached, their neighbors early on in this process. You're getting too far. And the door has always been open on the tribal side, and if the court thinks the circuit mediator might be of assistance, we would gladly participate in that process. I think as a practical matter, there's been a lot of water under the bridge since those days, but if the court would like us to do that, we'd be happy to participate. Thank you. We're going to see how fast my lips can move and how quickly yours can listen. Alaska versus Babbitt, that was an actual trust case. I mean, I think it's really important. That land was held in trust on the public record. The question becomes whether ancillary rights can be foreclosed by that fact. Very different in this case. Duncan. Yes, no one disagrees. The United States can develop trust rights by the nature of the status of them as the government and the trustee and the Indians as the trustor and the ward. There is no question about that. Can they divest their people of rights by the nature of that relationship and that duty? That's really the question here, and is that what the Quiet Title Act was about? Could they not access by other means? He went through, they'll never get in there otherwise. Remember, this rancheria was purchased, and incidentally, Judge Schroeder, I believe you asked the question about the status of the rancheria. It's exactly the same. It was bought in fee. There's no mention in the record that that land is trust land. I don't dispute the United States has duties to the Indians. I don't dispute that if the United States did not provide them some kind of access to that land, the Indians could sue them. I don't dispute any of that. The question is can they take additional rights from my client to fulfill that obligation, and I suggest to you the Quiet Title Act was not meant to deal with that. The final point is from 1909 when they purchased that rancheria land until 1965 when they came and purchased the easement from Ms. Duncan, they got in there somehow, didn't they? There was another road. The United States let it go fallow because Ms. Drake let them use her road. So they had, and the United States can still give them access. They can still give them access. May I ask you the same question I asked your colleague? The issue of resolution? Yes. I'll tell you, we've talked long and hard about it. It's very difficult, and I can't talk to you about the ancillary facts that I think make it almost impossible. We'll try. If we want us to, we'll try. Okay. Thank you. Thank you. The case just argued is submitted for decision. We'll hear the last case on the calendar, Alvarez v. Woodford. Thank you. Thank you.
judges: Schroeder, Thomas, Clifton